# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1125

BRICKS, INC.,

*Petitioner,*

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

*Respondent.*

Petition for Review of an Order of the
Environmental Protection Agency,
Case No. 04-02.

ARGUED SEPTEMBER 15, 2005—DECIDED OCTOBER 21, 2005

Before FLAUM, *Chief Judge,* and RIPPLE and KANNE, *Circuit Judges.*

FLAUM, *Chief Judge.* In July 2000, Environmental Protection Agency Region 5 ("the EPA") filed a complaint against Bricks, Inc. ("Bricks"), alleging that Bricks violated the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"), by discharging dredge and fill material into wetlands without a section 404(a) permit, 33 U.S.C. § 1344. The EPA assessed class II civil penalties against Bricks, pursuant to section 309(g) of the CWA. 33 U.S.C. § 1319(g). The administrative law judge ("ALJ"), after two days of hearings, issued an Initial Decision in favor of the EPA.

Bricks appealed to the Environmental Appeals Board ("the Board"). The Board overturned the ALJ's Initial Decision, finding that the EPA had not proved its case by a preponderance of the evidence.

Bricks then filed a fee and expenses application with the ALJ, pursuant to the Equal Access to Justice Act ("EAJA"). 5 U.S.C. § 504; 28 U.S.C. § 2412. The EAJA allows a defendant who prevails in an action brought by a federal agency to recover its legal fees and expenses, unless the agency's position was substantially justified or if special circumstances would make an award unjust. 5 U.S.C. § 504(a)(1); 28 U.S.C. § 2412(d)(2)(A)(ii). Bricks contended that the EPA's position was not substantially justified and also argued that it was entitled to fees in excess of the statutory maximum of $125 per attorney hour. The ALJ granted Bricks' fees and expenses, but denied Bricks' request for attorney's fees in excess of the statutory maximum. The EPA appealed and Bricks cross appealed to the Board. The Board reversed the ALJ's award of fees, finding that the EPA was substantially justified in bringing its complaint against Bricks. Bricks petitions for review of the Board's decision and asks this Court to reinstate the ALJ's fee award and to award Bricks attorney's fees in excess of the statutory cap. For the following reasons, we deny Bricks' petition.

## I. Background

Bricks owns a triangular piece of farmland in North Aurora, Illinois that is bordered on the east by Orchard Road, the west by Deerpath Road, and the south by Interstate 88 ("the property"). The property is located approximately two to three miles east and fifteen miles south of Fox River, a navigable water, and one to two miles west of a non-navigable tributary of Blackberry Creek. A portion of the property contains wetlands.

In 1997, Bricks began planning to develop the property. Bricks wished to install an access road connecting the property to Orchard Road and Deerpath Road. Bricks hired Environmental Planning Team Chicago ("EPT") to perform a wetlands delineation on the property, following the procedures set forth in the U.S. Army Corps of Engineers' Wetlands Delineation Manual. EPT found that there were approximately eleven acres of wetlands on the property, one-third of an acre of which would be filled to construct the access road, and advised Bricks that it would need to obtain a Nationwide or Individual Permit before filling the wetlands.[1] Bricks directed its engineering consultant, Manhard Consulting, Inc. ("Manhard") to obtain permits from the Corps, and Manhard hired Environmental Consultants and Planners ("ENCAP") to obtain any necessary permits. ENCAP concluded that Bricks' plans to install the access road would impact 0.3 acres of wetlands and would be covered under a Nationwide Permit. ENCAP then

---

[1] Nationwide Permits are intended to authorize routine activities with little paperwork and delay. At issue here are Nationwide Permits 14 and 26, which were effective during the period in which Bricks' fill activity took place. Nationwide Permit 14, entitled "Road Crossings," authorized fill activity for the construction of roads crossing "waters of the United States," including wetlands, so long as that activity complied with certain restrictions. 61 FED. REG. 65,874, 65,915 (Dec. 13, 1996). Nationwide Permit 26, entitled "Headwaters and Isolated Waters Discharges," allowed discharge of dredged or fill material into headwaters and other non-tidal waters and their adjacent wetlands, if the discharge would not cause the loss of more than three acres of waters of the United States. *Id.* at 65,916. A party wishing to discharge fill material that would cause the loss of more than one-third of an acre was required to submit a Pre-Construction Notification to the Corps before commencing. *Id.* Additionally, the Corps has authority to grant after-the-fact permits, in accordance with the regulations promulgated under section 404 of the CWA. 33 C.F.R. § 326.3(e)(1).

submitted a Pre-Certification Notification to the Corps, asking the Corps to confirm that the project was covered under a Nationwide Permit.

Bricks began constructing the access road before it received a response from the Corps, completing the road between August 23 and 25, 1999. The Corps notified Bricks on August 23, 1999 that it had received Bricks' Pre-Construction Notification and that, according to a preliminary evaluation, the project would require authorization under Nationwide Permit 26 or under an Individual Permit.

Subsequently, the Corps was informed that Bricks was already developing the property. A Corps employee visited the property and observed that Bricks had placed fill in a wetland area while constructing the access road. The Corps issued a Cease and Desist Order to Bricks on August 26, 1999. During later investigations, employees of the Corps, the EPA, and the local Soil Conservation District found that Bricks had destroyed wetlands when constructing the access road and two retention basins.

The Corps then responded by letter to Bricks' Pre-Certification Notification. The Corps reported that Nationwide Permit 14 would cover Bricks' construction of the access road, but not the two retention basins. Bricks would need to obtain an after-the-fact permit to be covered by Nationwide Permit 26. While Bricks was attempting to obtain an after-the-fact permit from the Corps, the EPA issued a Findings of Violation and Compliance Order ("Compliance Order") stating that Bricks was in violation of section 301 of the CWA. 33 U.S.C. § 1311. The Compliance Order required Bricks to submit an after-the-fact application to the EPA, containing a mitigation plan for restoring wetlands located on the property. Bricks submitted the application in January 2000. On June 7, 2000, the Corps issued Bricks an after-the-fact permit pursuant to Nationwide Permit 26, authorizing Bricks to discharge materials into 1.05 acres of

wetlands on the property.

On July 21, 2000, the EPA filed an administrative complaint, alleging that Bricks used bulldozers and other earthmoving machinery to discharge approximately 8,000 cubic yards of fill into wetlands on its property; that, under the CWA, this activity constituted discharge of pollutants; and that because Bricks did not have a permit under section 404 of the CWA, 33 U.S.C. § 1344, Bricks had violated section 301 of the CWA, 33 U.S.C. § 1311. The complaint also alleged that the wetlands are adjacent to an unnamed tributary of Blackberry Creek, which is itself a tributary of Fox River, an interstate water within the ambit of the CWA. This made the wetlands "waters of the United States," protected by the CWA. *See* 33 U.S.C. § 1362(7). Bricks responded by arguing, among other things, that the wetlands were isolated and did not fall under CWA jurisdiction. Therefore, according to Bricks, the company was not required to obtain a section 404(a) permit. *See* 33 U.S.C. § 1344(a).

The ALJ commenced a two-day hearing to consider the EPA's complaint. The ALJ found in his Initial Decision that the EPA had shown by a preponderance of evidence that Bricks violated section 301 of the CWA by filling wetlands located on the property. Section 301(a) prohibits any person from discharging dredged or fill material into waters of the United States, 33 U.S.C. § 1311(a); 33 U.S.C. § 1362(6), unless the Corps issues a permit, 33 U.S.C. § 1344(a). Under regulations promulgated by the Corps, "waters of the United States" include waters that "are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce" (*i.e.,* "navigable waters"), 33 C.F.R. § 328.3(a)(1), tributaries of those waters, 33 C.F.R. § 328.3(a)(5), and "[w]etlands adjacent to" waters of the United States or their tributaries, 33 C.F.R. § 328.3(a)(7). The EPA and Bricks agreed that the property contains wetlands.

Bricks argued, however, that the wetlands were "isolated"—not connected to waters of the United States—and hence not covered by the CWA. Bricks' central legal argument was that the EPA was precluded from asserting jurisdiction over the wetlands located on the property, because of the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), in which the Court rejected the Corps's argument that isolated ponds were "navigable waters" under the Migratory Bird Rule. The ALJ rejected this argument and pointed out that the Court in *SWANCC* had distinguished that case from *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), in which the Court found that wetlands adjacent to navigable water were navigable waters, based on the "significant nexus" between wetlands and navigable waters. *SWANCC*, 531 U.S. at 167. Bricks also argued that there was no hydrological connection between the wetlands on its property and navigable waters. The ALJ rejected this argument as well. The ALJ relied on the testimony of four witnesses and a site map prepared by Bricks' contractor to find that, although it was a "close question," the preponderance of the evidence demonstrated that the wetlands on Bricks' property were waters of the United States subject to the CWA. Specifically, the wetlands ran into a tributary of Blackberry Creek, and Blackberry Creek ran into Fox River, a navigable water. The ALJ assessed a $65,000 penalty against Bricks.

The Board reversed the ALJ's Initial Decision. The Board examined the testimony and evidence relied on by the ALJ and concluded that the EPA had failed to prove, by a preponderance of the evidence, that there was a hydrological connection between the wetlands on Bricks' property and the Fox River.

After the Board issued its Final Order reversing the ALJ's

Initial Decision in favor of the EPA, Bricks filed a claim with the ALJ for legal fees and expenses, pursuant to the EAJA. The ALJ, relying on *United States v. Hallmark Construction Co.*, 200 F.3d 1076, 1080 (7th Cir. 2000), determined that the EPA's decision to file a complaint against Bricks was not "substantially justified." The ALJ reasoned that because the Board had concluded that the EPA's testimony and evidence failed to establish a hydrological connection between the wetlands located on Bricks' property and a navigable water, Bricks was entitled to legal fees and expenses. However, the ALJ rejected Bricks' claim for attorney's fees in excess of the statutory maximum of $125.00 per hour, finding that Bricks failed to show that the case was sufficiently complex to justify a higher rate under the "special factor" standard contained in 5 U.S.C. § 504(b)(1)(A). The EPA appealed to the Board. Reviewing the ALJ's decision de novo, the Board reversed. The Board found that the EPA had presented evidence and testimony showing a possible hydrological connection between the wetlands located on Bricks' property and a navigable water. Additionally, the Board explained that the EPA had provided support for all of the elements of proof required by the CWA and that in this case the EPA could not have predicted that the Board would not find this support sufficiently persuasive. Bricks now appeals.

## II. Discussion

Bricks asks this Court to find, based on *Hallmark*, that the EPA's position in the underlying enforcement action was not substantially justified. Bricks further asks this Court to award it attorney's fees in excess of the $125.00 per hour maximum established by the EAJA. This Court will reverse the Board's decision to deny fees under the EAJA if that decision was unsupported by substantial evidence. 5 U.S.C. § 504(c)(2).

Bricks' central argument is that because the Board's decision in the underlying enforcement action was critical of the EPA's position, the Board should have awarded legal fees and costs under the EAJA. Specifically, the Board found (1) that the testimony of ENCAP employee Thomas Kehoe did not provide "the critical missing link" establishing a hydrological connection between the wetlands located on Bricks' property and Blackberry Creek or a tributary thereof; (2) that the testimony of Randolph Briggs, of the local Soil Conservation District, was "ambiguous" and "unconvincing" as to whether a channel located south of Interstate 88 existed at the time Briggs surveyed the site and whether the channel flowed into Blackberry Creek; (3) that the Board had "serious doubts" about the reliability of the notations on a map prepared by Bricks' engineers, which the EPA used to establish a hydrological connection; and (4) that, taken as a whole, the EPA's "case suffers from a fatal lack of clarity" and is "contradictory and inconclusive at best."

*Hallmark* outlines a three-part test for determining whether an agency's position was substantially justified. The EPA's decision is substantially justified if "its position was grounded in '(1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced.'" *Hallmark*, 200 F.3d at 1080 (quoting *Phil Smidt & Son, Inc. v. NLRB*, 810 F.2d 638, 642 (7th Cir. 1987)). *Hallmark* also makes clear that "the outcome of a case is not conclusive evidence of the justification for the government's position." *Id.* at 1079. Instead, the Board's analysis should "contain an evaluation of the factual and legal support for the government's position throughout the entire proceeding." *Id.* at 1080.

In a case such as this one, where the Board's opinion appears strongly to favor a defendant who has prevailed in an underlying suit brought by the government, the Board is

required to provide a "more thorough explanation for denying attorney's fees to the prevailing party." *Id.* at 1079.

In *Hallmark*, the Corps, through the U.S. Attorney, filed a complaint in federal district court alleging that Hallmark had discharged pollutants into a wetland area, in violation of the CWA. The district court found for Hallmark and concluded that the Corps had acted in an arbitrary and capricious manner by classifying the defendant's property as wetlands. *United States v. Hallmark Constr. Co.*, 30 F. Supp. 2d 1033, 1041 (N.D. Ill. 1998). The district court also found that the Corps's determination "was not based on a consideration of the relevant factors and evidence" and that "[m]uch of the government evidence rested on speculation and conjecture." *Id*. Nonetheless, the district court denied Hallmark's request for legal fees and costs under the EAJA. Hallmark appealed, and this Court reversed and remanded, because the district court failed to reconcile its denial of Hallmark's EAJA fee request with the strong language it had used in the underlying case. *Hallmark*, 200 F.3d at 1081. The Court explained that "the district court's conclusion on the merits that the government's position was 'arbitrary and capricious' appear[ed], at least on the surface, to be at odds with its subsequent conclusion that the government's position was 'substantially justified.'" *Id.* This Court explained that "[a]lthough there is no presumption that a prevailing party against the government will recover attorney's fees under the EAJA, the government bears the burden of proving that its position meets the substantially justified standard." *Id.* at 1079 (internal citations omitted).

In this case, the Board properly concluded that the EPA's position in the underlying enforcement action was substantially justified. As an initial matter, the Board's decision reversing the ALJ's Initial Decision was not the "slam dunk" that Bricks implies. The Board made clear that it was "not rul[ing] out the possibility that a hydrological

connection exists between [the wetlands on Bricks' property] and Blackberry Creek or a tributary thereof." Instead, the Board "simply h[e]ld that the [EPA] ha[d] not met its burden of proving such a connection by a preponderance of the evidence." In *Hallmark*, by contrast, the district court below found that the Corps's decision to classify Hallmark's property as wetlands was arbitrary and capricious, not simply insufficient to establish the Corps's case by a preponderance of the evidence.

Additionally, in this case the Board provided a sufficient explanation to reconcile its decision for Bricks in the underlying enforcement action with its denial of fees and costs to Bricks under the EAJA. Examining the administrative record as a whole, the Board found that the EPA had "presented a significant amount of evidence pointing to a possible hydrological connection between the [wetlands located on Bricks' property] and a navigable water or a tributary thereof to the south," including testimony and map notations. The Board explained that "this is not a situation where the [EPA] omitted a crucial element of proof from its case; rather, this is a situation where the proof was in fact presented, but it fell short, in the Board's view, of meeting the [EPA]'s Burden of Persuasion." The Board found that "[u]nder these circumstances, we would be hard pressed to conclude that the [EPA] lacked a reasonable basis to proceed" with its complaint against Bricks. Therefore, the Board concluded that it could not "expect the [EPA] to have predicted the outcome of the Board's determinations" because its decision in the underlying enforcement action "turned, in part, on the Board's findings and conclusions relating to the probative value of the witnesses' testimony, including doubts surrounding the depth of the witnesses' knowledge of the relevant circumstances as well as gaps, ambiguities, and contradictions in the testimony of the witnesses when considered in the aggregate."

The Board's distinction between a reversal based on the

credibility and weight of the agency's testimony and evidence and a reversal based on a missing "crucial element of proof" is supported by this Court's decision in *Europlast, Ltd. v. NLRB*, 33 F.3d 16 (7th Cir. 1994). In that case, we considered whether the NLRB should have awarded attorney's fees to an employer under the EAJA after the NLRB dismissed an unfair labor practices complaint that was brought against the employer. We affirmed the decision of the Board to deny the employer's application for fees, because "it was possible to draw a set of inferences" from the testimony offered by the NLRB that would have supported the NLRB's position. *Id.* at 18. Therefore, the NLRB's decision to file a complaint against the employer was substantially justified. *Id.* at 17; *cf. Temp Tech Indus., Inc. v. NLRB*, 756 F.2d 586, 590 (7th Cir. 1985) (NLRB's decision to litigate issue of company's alleged unlawful termination of striking employee turned on assessment of employee's credibility and fact that ALJ did not find employee credible did not mean NLRB's position was not substantially justified or that company was entitled to a fee award under the EAJA).

In this case, the EPA presented testimony and evidence to show a hydrological connection between the wetlands located on the property and Blackberry Creek, but the Board found that the testimony and evidence was not sufficient to meet the EPA's burden of persuasion. Specifically, the Board found that while the testimony of Thomas Kehoe showed that a drainage ditch ran from the property to the south under Interstate 88, it did not show that a hydrological connection existed to the south of Interstate 88; that while the testimony of Randolph Briggs showed that there was an "S" shaped channel located to the south of Interstate 88, Mr. Briggs did not specifically state that the channel existed in 1999 or was "continuously flowing"; that while Amy Nerburn testified that a hydrological connection existed, her opinion was based on a docu-

ment containing a watershed plan, rather than her personal knowledge; and that while Thomas Slowinski testified that drainage from the general area of Bricks' property flowed into Blackberry Creek, he also testified that there was no defined stream channel to the south of Interstate 88.

Similar to the NLRB in *Europlast*, 33 F.3d at 18, the Board decided not to infer from the above testimony that a hydrological connection existed between wetlands located on the property and Blackberry Creek. But the Board also did not rule out the possibility that there was a hydrological connection, and it cited approvingly the ALJ's decision in the underlying enforcement action that the existence of a hydrological connection was a "close question." In this Circuit, although not dispositive,"the closeness of the question is, in itself, evidence of substantial justification." *Cummings v. Sullivan*, 950 F.2d 492, 498 (7th Cir. 1991).

In sum, we find that the Board's decision to deny Bricks' request for legal fees and expenses was supported by substantial evidence. The EPA had a reasonable basis for pursuing its hydrological connection theory, even though the Board did not ultimately find in the EPA's favor.[2]

---

[2]   The Board did not discuss whether the hydrological connection theory pursued by the EPA had a reasonable basis in law. *See Hallmark*, 200 F.3d at 1080. Bricks maintains that the Supreme Court's decision in *SWANCC*, 531 U.S. 159, discredited that theory. However, the ALJ correctly found in the underlying enforcement proceeding that *SWANCC* held only that the Corps had exceeded its authority under the CWA by extending the definition of "navigable waters" to include isolated ponds used as habitat by migratory birds. *Id.* at 171. The Supreme Court was careful to distinguish *SWANCC* from *Riverside Bayview Homes*, 474 U.S. 121, in which the Court found that "Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands 'inseparably bound up with the

(continued...)

Because we agree with the Board that an award of Bricks' legal fees and expenses is inappropriate, we need not reach the issue whether Bricks is entitled to attorney's fees in excess of the statutory maximum.

## III. Conclusion

---

[2] (...continued) "waters" of the United States.'" *SWANCC*, 531 U.S. at 167 (quoting *Riverside Bayview Homes*, 474 U.S. at 134). Additionally, regulations promulgated by the Corps include within the definition of "waters of the United States" wetlands adjacent to waters of the United States or their tributaries. 33 C.F.R. § 328.3(a)(7). In *United States v. Gerke Excavating, Inc.*, 412 F.3d 804, 807 (7th Cir. 2005), we cited that regulation approvingly and found that if waters from wetlands enter a stream that flows into a navigable water, those wetlands are "waters of the United States" under the CWA. *See also Carabell v. U.S. Army Corps of Eng'rs*, 391 F.3d 704, 710 (6th Cir. 2004) (wetlands adjacent to but separated by a man-made berm from a ditch that flowed into tributaries of navigable waters are "waters of the United States" subject to CWA jurisdiction); *United States v. Rapanos*, 376 F.3d 629, 642 (6th Cir. 2004) (wetlands with a surface water connection to tributaries of navigable waters are subject to CWA jurisdiction). We note that the Supreme Court has granted a writ of certiorari in *Carabell* and *Rapanos* to consider whether wetlands that are hydrologically isolated from any "waters of the United States" are subject to CWA jurisdiction. ___ S. Ct.___, 2005 WL 2493858 (U.S. Oct. 11, 2005). The Court's decision in that case will not affect our decision here, because the EPA's complaint against Bricks was based on the theory that the wetlands on Bricks' property are hydrologically connected to waters of the United States—that is, the wetlands are adjacent to a tributary of Blackberry Creek, and Blackberry Creek flows into Fox River, a navigable water.

For the foregoing reasons, Bricks' petition for review of the Board's decision denying Bricks its legal fees and costs is DENIED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*